IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | CRIMINAL NO. 1:21-CR-9 |
| : | |
| **v.** : | (Judge Conner) |
| : | |
| **ROBERT JURSALUM BROWN,** : | |
| : | |
| **Defendant** : | |

# MEMORANDUM

Defendant Robert Brown moves to suppress evidence of drug trafficking obtained during a search of his apartment and vehicle pursuant to a warrant. He also moves for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). We will deny both requests.

## I.   Factual Background[1]

On May 19, 2020, Harrisburg Bureau of Police Detective Jason Paul—then an 18-year veteran of the force with hundreds of drug investigations under his belt—received a tip from a confidential informant that an individual was dealing drugs in the city. (See Doc. 46-3 at 2; 9/2/20 Tr. 3:11-4:8, 5:1-5, 9:11-16). The informant came to Detective Paul's attention via the Swatara Township Police Department, whose officers had arrested the informant after observing him buying drugs from a vehicle investigators later learned was registered to Brown. (See 9/2/20 Tr. 9:23-10:11).

---

[1] The following factual narrative primarily derives from the affidavit of probable cause and related exhibits attached to Brown's motion, (see Doc. 46-3), along with testimonial evidence adduced at the preliminary hearing that occurred before Dauphin County Magisterial District Judge Barbara W. Pianka on September 2, 2020, (see Doc. 46-4). Citations to the preliminary hearing transcript are abbreviated as "9/2/20 Tr. __."

After their arrest, the informant expressed an interest in cooperating with law enforcement. (See id. at 10:12-19).

Detective Paul and his colleagues commenced an investigation into the alleged drug dealer with the informant's assistance. (See id. at 5:1-5). The investigation developed along the following lines: During an initial meeting with Detective Paul, the informant indicated they could purchase crack cocaine from an individual going by the street name "Gangster," whom they described as a "tall black male with very long braids." (See Doc. 46 at 2). The informant described Gangster as driving a blue car and provided a cell phone number they claimed Gangster used to arrange drug deals. (See id.) They also admitted to visiting Gangster's residence on the corner of Penn and Calder Streets in Harrisburg, and reported that when Gangster was not selling drugs from his residence he would do so from the city's "hill area."[2] (See id.) According to the affidavit, "[a]t that time," Detective Paul "believed this male to be Robert Brown." (Id.) The informant agreed to return the next day to conduct a controlled purchase. (See id.)

Detective Paul met the informant at approximately 10:00 a.m. on May 20 and drove them to the intersection at Penn and Calder Streets. (See id.) There the informant identified the apartment building at 205 Calder Street as Gangster's residence. (See id.) The informant positively identified Brown as Gangster from a photograph Detective Paul displayed. (See id.) The informant then placed a call to

---

[2] The court takes judicial notice that the "hill area" refers to Harrisburg's Allison Hill neighborhood.

the cell phone number they previously provided to the detective and ordered a quantity of crack cocaine from the person who answered. (See id.) That individual agreed to the sale and told the informant to meet him in a nearby alley. (See id.) Surveillance units got into position at the meetup location while Detective Paul searched the informant to confirm they did not possess any contraband or United States currency. (See id.) The detective then accompanied the informant to the alley and listened as they called the dealer back to say they had arrived. (See id.) Before exiting Detective Paul's vehicle, the informant received prerecorded funds with which to complete the transaction. (See id.) The informant did not meet with anyone else or leave the investigators' sights. (See id.)

     As the informant walked to the meetup spot, another detective who had been monitoring 205 Calder Street broadcast that someone had just exited the rear of the residence and was heading toward the informant's location. (See id.) That person was Robert Brown. (See id.) Brown approached the informant and conducted a hand-to-hand exchange, which detectives caught on camera. (See id.) The informant quickly parted ways with Brown, returned to Detective Paul, and relinquished a quantity of crack cocaine; they no longer had any of the prerecorded bills on their person. (See id.) Brown walked back to 205 Calder Street, where the surveilling detective noted he did not use the exterior stairs to reach the second or third floor apartments, leading the detective to believe Brown resided on the first floor. (See id.) Detective Paul returned to 205 Calder Street in a vehicle the next morning to assess whether the rear entrance led directly into an apartment or to a

3

communal hallway.  (See id.)  As he drove past, he saw Brown standing on the back porch of the residence near an open door.  (See id.)

On May 28, Detective Paul met with the informant to plan another controlled buy.  (See id.)  The second transaction largely tracked the first, except Brown told the informant to enter the front door of 205 Calder Street to complete the sale.  (See id.)  Detective Paul searched the informant, gave them prerecorded funds, and dropped them off nearby.  (See id.)  The informant entered the building and returned "within seconds" *sans* cash and with more crack cocaine in hand.  (See id.)  The informant told the detective they believed Brown lived on the first floor because they heard a door shut as soon as they walked in and immediately saw Brown open the door to the interior hallway.  (See id.)  Unlike the first transaction, no investigators witnessed this exchange.

Detectives conducted a third controlled purchase with the informant's assistance on June 2.  Around 10:00 a.m., the informant called Brown, who told them to go to a gas station at North 6th and Maclay Streets.  (See id.)  Police officers searched the informant before driving them to the meetup location and giving them marked bills.  (See id.)  At the gas station, investigators observed a blue Nissan Maxima idling at a gas pump; the vehicle's license plate number was registered to Brown.  (See id.)  The informant approached the vehicle, got into the front passenger seat, and exited after a few seconds, leaving the area on foot.  (See id.)  A detective picked up the informant, who again handed over quantities of cocaine.  (See id.)  Investigators then followed Brown to 205 Calder Street and watched him enter the front door of the building.  (See id.)  Later that afternoon, Detective Paul

4

contacted a parole officer who confirmed Brown was on parole for a state offense and lived in Apartment #1 at 205 Calder Street, which comprises "the entire 1st floor of the building." (See id.)

Detective Paul subsequently applied for a warrant to search Brown's residence and vehicle along with the building's curtilage based on information ascertained in his investigation. (See id. at 1-3). Dauphin County Magisterial District Judge Pianka approved the warrant. (See id. at 1). Early on the morning of June 5, members of the Dauphin County Crisis Response Team ("CRT") went to Brown's apartment to execute the warrant. (See 9/2/20 Tr. 4:19-23). CRT officers knocked on the door to Apartment #1 and identified themselves as police. (See id. at 6:1-3). Receiving no response but hearing "some rustling around" inside, they forcibly entered the apartment. (See id. at 6:6-7, 13:18-14:2).[3] Brown stood in the doorway to the bathroom. (See id. at 6:7-9). After being detained and Mirandized, Brown denied he had contraband inside the apartment. (See id. at 6:9-21). Detective Paul searched the bathroom, where he retrieved a baggie containing approximately 23 grams of crack cocaine from the toilet bowl. (See id. at 6:21-7:4).

Investigators recovered approximately $12,000 in cash from Brown's apartment. (See id. at 7:19-21). Nearly the entire hoard consisted of $20 bills, though detectives found none of the prerecorded bills used in the controlled buys.

---

[3] Detective Paul testified the forced entry was a planned contingency given the informant's warning, not mentioned in the affidavit, that they previously had seen Brown with a gun. (See 9/2/20 Tr. 13:21-14:5). Investigators found ammunition but no firearms in Brown's apartment. (See id. at 14:6-15; Doc. 46-3 at 4).

5

(See id. at 8:7-9, 14:23-15:9). When one of the officers called the phone number provided by the informant, a cell phone lying next to Brown's bed began to ring. (See id. at 8:14-19, 18:24-19:6). Detectives discovered four bags containing between three and four grams of a substance that later tested positive for methamphetamine hidden under a rock in the fenced-in portion of Brown's backyard. (See id. at 7:14-18, 8:20-9:4, 15:10-16:16, 17:17-19). They also found $2,000 inside Brown's vehicle. (See id. at 8:12-13).

## II. Procedural History

The Commonwealth charged Brown with possession of a controlled substance with intent to distribute. On September 2, 2020, Judge Pianka held a preliminary hearing to assess whether the charge against Brown was supported by *prima facie* evidence. Detective Paul testified at the hearing regarding the investigation into Brown's alleged criminal activities and the search of his home, and Judge Pianka held the case for court. Thereafter, in February 2021, a federal grand jury indicted Brown on four counts of possession with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1) arising from his arrest by state authorities. Brown pled not guilty and now moves to suppress all evidence seized from his residence and vehicle. The motion is fully briefed and ripe for disposition.

## III. Discussion

Brown asserts a Franks hearing is warranted because Detective Paul's answers under cross-examination at the preliminary hearing supposedly contradict his averments in the affidavit of probable cause and because he omitted certain facts about the informant. (See Doc. 47 at 2-5, 7-8). Brown also urges the court to

6

suppress the evidence seized from his apartment and vehicle on the ground that the warrant was unsupported by probable cause. (See id. at 7-11). We address each claim *seriatim*.

### A. Franks Hearing

A criminal defendant may challenge the truthfulness of factual statements contained in an affidavit of probable cause through what is commonly referred to as a Franks hearing. See generally Franks, 438 U.S. 154. A defendant seeking a Franks hearing must make "a substantial preliminary showing" that the affiant knowingly or recklessly included a materially false statement in, or omitted material information from, the affidavit of probable cause. United States v. Aviles, 938 F.3d 503, 508 (3d Cir. 2019) (citing Franks, 438 U.S. at 155-56). However, if the challenged information is immaterial—that is, unnecessary to the finding of probable cause— no hearing is required. See id. at 508-09. When assessing the materiality of alleged falsehoods or omissions, courts "must perform a word-by-word reconstruction of the affidavit" to determine whether the reconstructed affidavit still would suffice to establish probable cause. See Dempsey v. Bucknell Univ., 834 F.3d 457, 470 (3d Cir. 2016).

#### 1. *Alleged Falsehoods*

Brown primarily grounds his request for a Franks hearing in a brief exchange between defense counsel and Detective Paul during the preliminary hearing before Judge Pianka. Specifically, when defense counsel asked Detective

Paul whether he knew "Gangster's" real name after his first meeting with the informant, the detective replied:

> I knew who Robert Brown was.  I didn't think him to be Gangster.  I didn't know of him.  But he was always a Hill guy; I think it was 19th and Bellevue, so I didn't realize it was him until after the first deal.  But I didn't know that was his nickname.

(See 9/2/20 Tr. 9:11-22).  Brown contrasts this explanation with Detective Paul's written averments that, upon hearing the informant's physical description of Gangster, he "*believed this male to be Robert Brown*," and that the informant positively identified Brown ahead of the initial transaction.  (See Doc. 47 at 2-5 (quoting 9/2/20 Tr. 9:11-22; Doc. 46-3 at 2) (Brown's emphasis)).  Brown claims these statements reveal Detective Paul "*knew* Robert Brown was Gangster *before*" the first controlled buy.  (See Doc. 47 at 5 (first emphasis added)).  According to Brown, Detective Paul's testimony contradicts Detective Paul's attestation in the affidavit that he was unaware of Gangster's true identity "until *after* the first [controlled] purchase."  (Id. at 5).

We find no such discrepancy.  Contrary to Brown's assertion, Detective Paul averred only that he "believed" Gangster and Brown to be one and the same after his first meeting with the informant, not that he "knew" it for a fact.  (See Doc. 46-3 at 2).  The detective's belief was bolstered by the informant's positive identification of Brown from a photograph in the runup to the controlled buy the next day. But it was not vindicated until Detective Paul personally witnessed the informant meet Brown, thereby confirming the latter's identity (and validating the informant's tip).

In this light, Detective Paul's testimony that he "didn't realize" Gangster was Brown "until after the first deal" betrays no falsehood in his affidavit.

Moreover, even if we read the supposed discrepancy as an intentional and reckless falsehood, it would be immaterial. The warrant application describes several other ways in which investigators independently established Gangster was Brown. They identified Brown through visual surveillance, vehicle ownership records, and parole records listing his address as Apartment #1 at 205 Calder Street. The informant's photographic identification was by no means necessary to ascertaining Gangster's identity. Thus, assuming *arguendo* Brown could prove Detective Paul misled Judge Pianka about when he learned Gangster's identity—which, to be clear, Brown has not done—whether the detective knew Brown's alias before or after the first sale is immaterial to the probable cause assessment.

### 2.   *Alleged Omissions*

Brown also argues Detective Paul omitted certain critical facts undermining the informant's credibility, namely how long he knew the informant, his assessment of the informant's credibility, and details about the informant's criminal history and alleged drug addiction. (See Doc. 47 at 7-8). We recognize in some contexts police officers must affirmatively disclose information pertinent to assessing the credibility of a confidential source or witness. See United States v. Coles, 552 F. Supp. 3d 471, 486 n.13 (M.D. Pa. 2021) (Conner, J.) (citing United States v. Glover, 755 F.3d 811, 817 (7th Cir. 2014) (affiant's "complete omission of known, highly relevant, and damaging information about [witness's credibility" deprived judge of information material to probable cause determination)); United States v. Larnerd, 514 F. Supp.

9

3d 660, 669, 675-76 (M.D. Pa. 2021) (Wilson, J.) (affiant "did not have any information to corroborate [named witness'] statement that Larnerd," a convicted felon, "possessed two firearms when he prepared the application for a search warrant"). In Coles, for instance, we held the magistrate would have wanted to know Torey White, who provided information against Coles, had failed his own polygraph test the day before he spoke with detectives and was himself a prime suspect for the murders. See Coles, 552 F. Supp. at 486 n.13. Such information inarguably called White's credibility and motives into question.

      The circumstances before us stand in stark contrast. Brown identifies general details he thinks Detective Paul should have told the magistrate, but those facts do not suggest the informant held ulterior objectives or sought to cast undeserved suspicions on an otherwise innocent bystander. Judge Pianka could easily surmise from the affidavit that the informant has a drug problem given their experience and the relative ease with which they frequently contacted Brown to buy crack cocaine, a highly addictive drug. (See Doc. 46-3 at 2); cf. United States v. Woodfork, 999 F.3d 511, 517 (7th Cir. 2021) ("[I]t it is not a stretch to assume that the judge here knew that a confidential source buying methamphetamine likely had some criminal history."). Similarly, a reasonable magistrate likely would assume the informant received favorable treatment by agreeing to assist the investigation of Brown. (See Doc. 46-3 at 2); see also Woodfork, 999 F.3d at 517 ("[W]e agree with the district court that the omission of information about the sources' . . . motives does not change the probable cause determination."). Reconstructing the affidavit with this information included would not alter the probable cause analysis.

10

Whether Detective Paul's affidavit establishes probable cause to search Brown's residence does not turn on the informant's credibility in substantial part because numerous law enforcement officers directly witnessed Brown's illicit activities during the first and third controlled purchases. Setting aside the second transaction, the details of which were known only to the informant, the affidavit contains ample information independently linking Brown to drug dealing on two other occasions. Investigators ensured the informant had no contraband or money on their person before meeting with Brown on May 20 and June 2. (See Doc. 46-3 at 2). They gave the informant prerecorded funds, saw the informant interact with no one other than Brown, monitored both throughout the transaction, and recovered quantities of crack from the informant after each meeting. (See id.) Whatever doubts inclusion of the informant's criminal history, substance abuse, or cooperation incentives might have created regarding the informant's personal credibility, they cannot detract from such damning factual averments.

Brown has failed to make a substantial preliminary showing that the affidavit contains false statements or omits material information. Accordingly, we will deny his request for a Franks hearing.

### B.     Probable Cause for Search Warrant

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. See U.S. CONST. amend. IV; Horton v. California, 496 U.S. 128, 133 (1990). To search a home, the constitutional default is that a warrant is required. See Payton v. New York, 445 U.S. 573, 586 & n.25 (1980) (citations omitted). For a search warrant to issue, a neutral magistrate

11

must find, under the totality of the circumstances, that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).  Courts reviewing such determinations do not make a *de novo* probable cause assessment; they "simply [] ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." United States v. Miknevich, 638 F.3d 178, 182 (3d Cir. 2011) (second alteration in original) (quoting Gates, 462 U.S. at 238-39).

The Supreme Court of the United States views probable cause as an amorphous concept, "not readily, or even usefully, reduced to a neat set of legal rules."  See Ornelas v. United States, 517 U.S. 690, 695-96 (1996) (quoting Gates, 462 U.S. at 232).  Its existence must be determined from the view of the officer on the street, not the judge in the courtroom.  See United States v. Sokolow, 490 U.S. 1, 7-8 (1989); see also United States v. Cortez, 499 U.S. 411, 418 (1981).  Whether probable cause exists is an objective determination based upon the totality of the circumstances present at the time of the challenged governmental conduct.  See United States v. Williams, 413 F.3d 347, 353 n.6 (3d Cir. 2005).  Probable cause "is not a high bar."  Kaley v. United States, 571 U.S. 320, 338 (2014).

Brown asserts probable cause is lacking here on two grounds.  The first involves the previously discussed affidavit omissions, which Brown claims undercut the informant's reliability and thus the issuing court's findings.  (See Doc. 47 at 7-8). We reject this argument for the reasons already given.  See *supra* pp. 9-11.  The second argument homes in on Detective Paul's decision to show the informant a photograph of Brown before the first controlled buy, which Brown contends was

12

unduly suggestive. (See Doc. 47 at 9-11). Suggestive or not, the identification is irrelevant to our review. The affidavit contains other significant indicia of Brown's identity—initially contributed by the informant and later corroborated by investigators—including Brown's physical appearance, a description of his vehicle, the intersection at which he resided, and the cell phone number he used to set up drug deals with the informant. (See Doc. 46-3 at 2).

Nonetheless, we will exclude the informant's contributions from our analysis and focus solely on the information derived from the investigators' direct observations. Even then, we find the affidavit adduced ample facts justifying issuance of a warrant. Critically, Detective Paul avers he facilitated a controlled purchase on May 20, 2020, and personally witnessed Brown and the informant engage in a hand-to-hand exchange of cash for drugs. (See id.) After completing that transaction, the informant possessed a bag of crack and no longer had the prerecorded bills supplied by the detective. (See id.) Another detective surveilled Brown as he returned to 205 Calder Street through the backyard; when Brown did not use the exterior stairwell to reach the upper apartments, the detective reasonably concluded Brown resided on the first floor. (See id.) The next day, Detective Paul saw Brown standing on the back porch near an open door to the building. (See id.) Brown's parole officer independently confirmed his first-floor address. (See id.) Three days before Brown's arrest, the informant met him at a gas station and obtained more drugs while inside Brown's vehicle; Brown then returned to the Calder Street building. (See id. at 2). Taken together, these facts more than adequately support the conclusion that Brown probably committed

13

multiple criminal drug-trafficking offenses and that evidence of those crimes likely would be found inside his residence, backyard, and vehicle. Thus, Judge Pianka had a substantial evidentiary basis upon which to issue a search warrant for those locations without considering any of the information Brown now contests.

## IV. Conclusion

For all these reasons, we will deny Brown's motion for a Franks hearing and to suppress physical evidence recovered from his residence. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:   December 21, 2022